No. 24-1526

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

FEDERAL TRADE COMMISSION,
*Plaintiff-Appellant*,

v.

NOVANT HEALTH, INC., ET AL.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of North Carolina
5:24-cv-00028-KDB-SCR (Hon. Kenneth D. Bell)

**EMERGENCY MOTION UNDER LOCAL RULE 27(e)
ACTION NEEDED BY 12:00 p.m., JUNE 21, 2024**

**FEDERAL TRADE COMMISSION'S MOTION
FOR AN INJUNCTION PENDING APPEAL**

ANISHA S. DASGUPTA
*General Counsel*

MARIEL GOETZ
*Acting Deputy General Counsel*

BENJAMIN F. AIKEN
JESSELYN FRILEY
MATTHEW M. HOFFMAN
*Attorneys*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
baiken@ftc.gov

## INTRODUCTION

The Federal Trade Commission asks this Court to enjoin pending appeal the acquisition by Novant Health, Inc., of Lake Norman Regional Medical Center (LNR). *See* FRAP 8(a); 4th Cir. R. 8(a), 27(e). Novant and LNR are head-to-head competitors in the northern suburbs of Charlotte, and the merger of these rivals may substantially lessen competition for inpatient hospital services in that market. The FTC is conducting an administrative proceeding to determine whether the merger violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and sought a preliminary injunction to preserve its ability to order effective relief and protect the public from a potentially anticompetitive merger. The district court denied the request and also denied the FTC's motion for an injunction pending appeal. The Commission therefore seeks emergency relief from this Court.

Absent this Court's intervention, Novant may consummate the acquisition of LNR after 12:00 p.m. on June 21, 2024. If that happens, it will be almost impossible to unwind the transaction and restore competition if the FTC finds the acquisition illegal. Accordingly, the Court should set an expedited briefing schedule for this motion and then enjoin the acquisition pending appeal. Defendants oppose the requested relief.

Relief pending appeal is warranted because the district court made serious legal errors in denying the Commission's request for a preliminary injunction. The

district court held that the FTC established a prima facie case of a Clayton Act violation by showing that the acquisition would result in a combined market share that is presumptively unlawful and would cause prices to rise substantially. The district court nonetheless denied relief based on findings that LNR's current owner, defendant Community Health Systems, Inc. (CHS), had no choice but to sell the hospital to Novant and that absent the sale LNR would "most likely close in the foreseeable future." ECF 227 (hereinafter "Op.") at 50.[1] But a "failing-firm" defense allows an otherwise anticompetitive merger to proceed only if the acquired firm's "resources [are] so depleted and the prospect of rehabilitation so remote that it face[s] the grave probability of a business failure." *Int'l Shoe Co. v. FTC*, 280 U.S. 291, 302 (1930). The district court never applied or cited this test, nor could it have held that LNR satisfied the strict requirements of a failing firm. Undisputed evidence shows that LNR is currently profitable and has solid quality ratings. While LNR faces competitive headwinds, there is no evidence that CHS will close the hospital if it is not sold to Novant, and defendants never made that argument.

Where an acquired firm does not face the prospect of imminent closure, it may in "rare cases" assert a "weakened-competitor" defense, which this Court has described as "the Hail-Mary pass of presumptively doomed mergers." *Steves &*

---

[1] The district court's opinion and other relevant record materials are included in the Appendix submitted herewith.

*Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 714 (4th Cir. 2021) (cleaned up). The district court invoked that defense but did not correctly apply it. The weakened-competitor defense applies only where the acquired firm's weaknesses (1) "cannot be resolved by any competitive means" and (2) "would cause that firm's market share to reduce to a level that would undermine the plaintiff's prima facie case." *Id.* The district court did not properly analyze either factor. It did not address whether CHS could have remedied LNR's weaknesses by means other than selling, and it improperly assumed LNR's market share would fall to zero, even though the weakened-competitor defense posits that the acquired firm will continue to exist. In light of these errors, the FTC is likely to prevail on appeal.

The equities also strongly favor issuance of an injunction pending appeal. If the merger proceeds now, it will irreversibly alter the status quo and irreparably harm the FTC's ability to order effective relief if the Commission finds the acquisition is unlawful. Recent history shows that hospital mergers are extraordinarily difficult to unwind once the parties combine operations and begin sharing competitive data like rate negotiations with insurers. Conversely, defendants will not be substantially injured by a short delay, and if the motion is granted, the FTC will seek to expedite this appeal to minimize delay. Any private harms from pausing the transaction cannot outweigh the public's strong interest in effective enforcement of the antitrust laws.

## JURISDICTION

The FTC sought a preliminary injunction pending an administrative adjudication under 15 U.S.C. § 53(b). The district court had jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and 1345. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1).

## BACKGROUND

### A.   Statutory Framework Under the Clayton and FTC Acts

Section 7 of the Clayton Act prohibits mergers and acquisitions that "may … substantially lessen competition" in "any line of commerce" and "any section of the country." 15 U.S.C. § 18. Congress directed the FTC to enforce the Clayton Act through administrative adjudication. If the Commission has reason to believe a transaction is unlawful, it issues an administrative complaint. 15 U.S.C. § 21(b). Following discovery and an adversary hearing, the Commission makes a final determination whether the transaction is unlawful. *Id.*; *see also* 16 C.F.R. Pt. 3. That determination is subject to review in the courts of appeals. 15 U.S.C. § 21(c).

Section 13(b) of the FTC Act authorizes the Commission to sue in district court for a preliminary injunction to block a transaction to preserve the status quo during the pendency of the administrative process. 15 U.S.C. § 53(b). A district court may issue a preliminary injunction "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b).

The district court's role is not to determine whether the transaction is likely to violate the antitrust laws, as "[t]hat adjudicatory function is vested in [the] FTC in the first instance." *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1342 (4th Cir. 1976). To show a likelihood of success, the Commission need not demonstrate a certainty or even a high probability of unlawfulness; it need raise only "questions going to the merits so serious, substantial, difficult and doubtful" that they are "fair ground for … determination by the FTC in the first instance." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714-15 (D.C. Circ. 2001). "[A]ny doubts are to be resolved against the transaction." *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3d Cir. 2016) (cleaned up). Additionally, the public interest standard is "not the same as the traditional equity standard for injunctive relief." *Id.* The standard focuses primarily on "the public's interest in effective enforcement of the antitrust laws" and gives little weight to private equities. *Id.* at 352.

One way the FTC may show that a transaction may substantially lessen competition is through an econometric method known as the Herfindahl-Hirschman Index ("HHI"), which is calculated by summing the squares of the individual firm's market shares. *Hershey*, 838 F.3d at 346; *see also* Op. 46. A market is deemed "highly concentrated" when the post-merger HHI is greater than 1,800, and a merger that increases the threshold by more than 100 points is presumptively unlawful. U.S. Dep't of Justice & FTC, *Merger Guidelines* § 2.1

(2023). Such evidence is sufficient to establish a prima facie case and shift the burden to defendants to produce evidence that the merger will not have anticompetitive effects. *Hershey*, 838 F.3d at 347.

**B.    The Proposed Acquisition**

This case involves Novant's proposed acquisition of LNR and Davis Regional Psychiatric Hospital ("Davis") from their current owner, CHS, for $320 million. The Commission does not object to the acquisition of Davis but is concerned that Novant's acquisition of LNR may substantially lessen competition in a market for adult inpatient general acute care services covered by commercial health plans in the northern Charlotte suburbs.

Inpatient general acute care services include medical, surgical, and diagnostic services requiring an overnight hospital stay. *See Hershey*, 838 F.3d at 338. These services are usually medically urgent and high-cost, and markets are highly localized, as patients prefer hospitals near their homes and insurers seek to include these hospitals in their provider networks. Op. 22-25.  Hospitals compete with each other in two ways: first, to secure favorable terms in their contracts with insurers, as those contracts determine how much insurers reimburse hospitals for providing a given service; and second, to attract patients covered by those insurers. *Hershey*, 838 F.3d at 342. A hospital's acquisition of a close substitute increases its bargaining power by eliminating an alternative contracting partner for the insurer.

*See ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 562 (6th Cir. 2014).

Insurers pass the higher reimbursement rates resulting from hospital consolidation

on to patients through higher premiums and out-of-pocket costs. *See* Op. 38-39.

Novant and LNR both provide inpatient general acute care services, and they

are direct competitors in the Eastern Lake Norman Area, a rapidly growing suburb

north of Charlotte with over 335,000 residents that is bounded by interstate

highways, traffic congestion, and Lake Norman. There are currently three inpatient

general acute care hospitals in the area. The dominant provider, which serves the

most patients, is Novant's Huntersville Medical Center, and its current competitors

are LNR and Iredell Memorial Hospital. Additionally, Atrium Health, another

large health care system, plans to open a new hospital, Atrium Lake Norman

(ALN) in the area soon. For purposes of market share calculations, the FTC's

expert treated ALN as if it were already open and operating at near-full capacity.

ECF 231 at 13 (citing ECF 99-3 (Tenn. Rebuttal Rpt. Tbl. 5)). With that

assumption, the hospitals' market shares in the Eastern Lake Norman Area market

would be as follows: Huntersville 44.6%, LNR 22.3%, Iredell 19.3%, and ALN

13.8%. *Id* at 14.

Novant and Atrium are the dominant competitors in a broader "Center-

City/Northern Charlotte Region," which includes the hospitals that over 90% of

Eastern Lake Norman Area residents visit and includes all meaningful substitutes

for Huntersville and LNR. Op. 44. Novant has two other hospitals in that region, while Atrium has four. *Id.* Once ALN opens, the Novant and Atrium hospitals in the broader market will have over 90% market share. ECF 231 at 13.

LNR's current owner, CHS, operates 71 hospitals and more than 1,000 sites of care across 15 states. Op. 15-16. CHS is publicly traded, with over $12.5 billion in net operating revenue in 2023, although it carries $11.5 billion in debt. *Id*. In North Carolina, CHS operates only LNR and Davis, which CHS converted from a general acute care hospital to a behavioral health hospital in 2022. *Id*. LNR is profitable and popular among local residents and provides quality care. Op. 3-4. Nonetheless, CHS claims that it has limited its investment in LNR because it prefers to prioritize investments in regions where CHS has a network of facilities and providers. Op. 16.

In July 2022, CHS began soliciting bids to sell LNR. Op. 21. CHS conducted outreach to a handful of in-state competitors but did not contact any out-of-state health systems or other in-state systems like Iredell. Tr. 1619 (Hammond). At least four local health systems asked for and received confidential information, and Novant submitted a bid. Op. 21. On February 28, 2023, Novant and CHS executed an Asset Purchase Agreement in which Novant agreed to pay CHS $320 million to acquire LNR, Davis, and related assets. Op. 22.

In January 2024, the Commission unanimously voted to issue an administrative complaint challenging the transaction and to file this action seeking a preliminary injunction under Section 13(b). The parties stipulated to a TRO barring defendants from closing on the transaction during the district court proceeding; as modified by the district court that order expires at 12:00 p.m. on June 21, 2024. ECF 16, 244.

## C.    The District Court's Order

Following an evidentiary hearing, the district court held that the FTC's evidence sufficiently established a prima facie case that Novant's acquisition of LNR would violate the Clayton Act. Nonetheless, the court denied the FTC's request for a preliminary injunction.

The district court held that the FTC had properly defined the relevant product market as inpatient general acute care services covered by commercial health plans. Op. 39-41. As to the geographic market, the court agreed that the Eastern Lake Norman Area "is an important market to both health systems and insurers because of its growing population and relative affluence," Op. 44, and acknowledged that both parties' experts had opined that this area satisfied the "hypothetical monopolist" test commonly used for market definition, Op. 45. *See, e.g.*, *Hershey*, 838 F.3d at 327 (discussing hypothetical monopolist test). The court nonetheless analyzed the transaction using the Center-City/Northern Charlotte

Region, on the theory that a broader market better reflected "commercial realities." Op. 45. Still, the court found that the FTC had proven a prima facie case for the broad market, based on HHI calculations from both sides' experts showing that the LNR acquisition was presumptively anticompetitive. Op. 2, 46-47. And the court agreed "that the reimbursement rates paid by insurers at LNR … are likely to rise substantially after [it is] integrated into Novant's insurance contracts." Op. 53.

The district court concluded, however, that defendants had rebutted the prima facie case by showing two "unique circumstances." Op. 48. First, the court cited testimony that CHS would close Davis—which is not in the product market because it does not provide general acute care services—absent the transaction. *Id.* Second, it stated that LNR "will not be able sustain its current level of competition" due to various competitive pressures, including the new Atrium hospital and CHS's lack of investment. *Id.* The court acknowledged this Court's decision in *JELD-WEN*, which set forth strict requirements for a "weakened-competitor" defense, but concluded that this case was "like [those] where the weakened-competitor defense has succeeded" because (1) "CHS had no other bidders for LNR or Davis despite reasonable attempts to sell the hospitals to others" and (2) the court believed that absent a sale, "LNR's competitive position will further erode to the point where it will most likely close in the foreseeable future, fully eliminating it as a competitor capable of being the subject of a prima

facie case." Op. 50. The court reached this conclusion even though CHS never testified that it planned to close LNR and defendants never argued that such closure was likely.

The district court then purported to balance the equities. While it accepted that the transaction would result in "substantially" higher prices across the board, the court nonetheless determined that "immediate" competitive harm would not be likely because Novant's executives had committed not to increase prices at LNR (or Davis) for three years. Op. 53. The court also concluded that the transaction would not be difficult to unwind if the Commission ultimately found that it violated the Clayton Act on the theory that it would not be "any harder to sell" LNR or Davis later on. Op. 53-54. Finally, the court held that Novant's promises to keep Davis open and to invest in LNR outweighed the equities that would favor an injunction. Op. 54-55.

## ARGUMENT

In determining whether to grant an injunction pending appeal, the Court considers: (1) likelihood of success on the merits of the appeal; (2) irreparable harm absent an injunction; (3) substantial harm to other parties if the injunction is granted; and (4) the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). Courts have often issued injunctions pending appeal in FTC merger cases where the district court has denied a preliminary injunction. *See, e.g.*, *Food Town*, 539

F.2d at 1345-46; *FTC v. Penn State Hershey Med. Ctr.*, No. 16-2635 (3d Cir.) (Order of May 24, 2016); *Heinz*, 246 F.3d at 713; *FTC v. Hosp. Bd. of Dirs*., 38 F.3d 1184, 1187 (11th Cir. 1994). An injunction is likewise proper here because the FTC has a strong likelihood of success on appeal and the public will be irreparably harmed if Novant is allowed to acquire LNR now.

## I.    THE FTC IS LIKELY TO SUCCEED ON THE MERITS OF THE APPEAL.

The FTC is likely to succeed on the merits of this appeal. The district court properly held that the FTC established a prima facie case that Novant's acquisition of LNR would violate the Clayton Act by showing that it would significantly increase concentration in a market that is already highly concentrated, creating a presumption of anticompetitive effect. Op. 47. That should have been enough to show a likelihood of success for purposes of a Section 13(b) preliminary injunction. *See, e.g.*, *Food Town*, 539 F.2d at 1342 ("The district court is not authorized to determine whether the antitrust laws have been or are about to be violated."); *Heinz*, 246 F.3d at 714-15 (FTC need only raise "questions going to the merits so serious, substantial, difficult and doubtful" that they are "fair ground for … determination by the FTC in the first instance"); *Hershey*, 838 F.3d at 337 ("[A]ny doubts are to be resolved against the transaction."). The district court instead took the extraordinary step of denying preliminary injunctive relief based

on a finding that defendants showed "unique circumstances" rebutting the FTC's case. Op. 48.

In reaching that conclusion, the district court committed serious legal errors. Most significantly, the district court effectively conflated the "failing-firm" defense with the related but distinct "weakened-competitor" defense and failed to apply either defense properly. The court also erred in holding that the possible closure of Davis—which does not even compete in the relevant product market—could rebut a showing of anticompetitive effects in the market for inpatient general acute care services. Finally, the district court failed to give proper weight to the public interest in preventing the consummation of potentially anticompetitive transactions and understated the difficulty of unwinding a completed acquisition.[2]

### A.     The District Court Did Not Properly Apply the Failing-Firm Defense.

One established way that a defendant can rebut a presumption of anticompetitive effect is through a "failing-firm" defense, which requires proof that the acquired firm would imminently go out of business, and thus cease playing a competitive role in the market, absent the transaction. *See Int'l Shoe*, 280 U.S. at

---

[2] The district court also erred by (1) analyzing the transaction using the broad Center City/Northern Charlotte Region market rather than the Eastern Lake Norman Area and (2) holding that alleged efficiencies could rebut the FTC's *prima facie* case absent any findings that the strict standards for an efficiencies defense were satisfied, *see, e.g.*, *Hershey*, 838 F.3d at 348-49

302; Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 953a (4th ed. 2015); *Merger Guidelines* § 3.1. The district court erred here by effectively applying a failing-firm defense (which defendants never asserted) without making the findings necessary to support that defense.

The requirements for the failing-firm defense are strict. Defendants must show that the acquired firm's "resources [are] so depleted and the prospect of rehabilitation so remote that it face[s] the grave probability of a business failure." *Int'l Shoe*, 280 U.S. at 302. That standard is not met where a firm is "solvent and profit-making," even if faces "substantial short-term liabilities." *Food Town*, 539 F.2d at 1345. The prospect of failure must be "imminent." *Dr. Pepper/Seven-Up Cos., Inc. v. FTC*, 991 F.2d 859, 864-65 (D.C. Cir. 1993). Additionally, the "prospects for reorganization" of the failing firm must be "dim or nonexistent," and the acquiring company must be the "only available purchaser." *Citizens Publ'g Co. v. United States*, 394 U.S. 131, 138 (1969).

In this case, the district court held that "unique circumstances" justified the transaction because (1) CHS had no bidders for LNR or Davis other than Novant and (2) absent a sale "LNR's competitive position will further erode to the point where it will most likely close in the foreseeable future, fully eliminating it as a competitor." Op. 48, 50. That analysis plainly implicates a "failing-firm" defense, even though the district court did not characterize it as such. But the district court

did not make the necessary finding that LNR faced a "grave probability" of "imminent" failure. Nor could it have on this record. The evidence shows, and the court held, that LNR is currently profitable, continues to attract patients, and performs reasonably well on safety and quality metrics. Op. 3-4. Indeed, the court noted that defendants' "doomsday characterization" was "mostly inaccurate and certainly exaggerated." Op. 3. And notably, while CHS executives testified that they would close *Davis* if the sale does not go through (Op. 48), they made no such claim about LNR either at the hearing or in their briefs. The district court's unsupported speculation that LNR would "most likely close in the foreseeable future" thus could not rebut the FTC's prima facie case under a failing-firm theory. An anticompetitive transaction should not be allowed to proceed simply because the owner of the acquired firm makes a voluntary decision to sell rather than to continue to invest in that firm. *See Warner*, 742 F.2d at 1164-65.

> ### B. The District Court Misapplied the Weakened-Competitor Defense.

This Court has also recognized that a "weakened-competitor" defense can rebut a presumption of anticompetitive effect. *JELD-WEN*, 988 F.2d at 704, 714. That defense applies where the acquired firm will not actually fail absent a sale but it is "too weak to affect competition" and there are "no competitively preferable alternatives to a merger with the acquiring company." *Id.* at 704. It requires a showing that the acquired firm's weakness (1) "cannot be resolved by any

competitive means" and (2) "would cause that firm's market share to reduce to a level that would undermine the plaintiff's prima facie case." *Id.* at 714 (cleaned up). "A defendant can show this only in rare cases, which is why the weakened-competitor defense has been described as the Hail-Mary pass of presumptively doomed mergers." *Id.* (cleaned up); *see also Kaiser Aluminum & Chem Corp. v. FTC*, 652 F.2d 1324, 1339, 1341 (7th Cir. 1981) (weakened-competitor defense "is probably the weakest ground of all for justifying a merger" and "certainly cannot be the primary justification of a merger in resistance to a § 7 proceeding").

The district court held that LNR "would not be able to sustain its current level of competition" because of various competitive headwinds it faced, including the impending entry of ALN and CHS's claim that it would not make additional investments in LNR. Op. 48. While these factors might be relevant to a weakened-competitor defense, the district court failed to properly conduct the analysis required by *JELD-WEN*. That was legal error.

As to the first prong of the weakened-competitor analysis, the district court stated only that there were "no other bidders for LNR or Davis." Op. 50. This finding mixes up the weakened-competitor defense with the failing-firm defense. As discussed above, a failing-firm defense requires proof that the acquiring firm is the "only available purchaser." *Citizens Publ'g*, 394 U.S. at 138, but the weakened-competitor defense looks more broadly at whether there are "*any* competitive

16

means" to address a weakness. *JELD-WEN*, 988 F.2d at 714 (emphasis added). The district court did not consider whether CHS could have addressed LNR's weaknesses through any means other than a sale and ignored undisputed evidence that CHS did not solicit bids from out-of-state firms and some in-state firms. *See supra* at 8.

With respect to the second prong, the district court did not conduct the analysis necessary to determine whether LNR's weaknesses would reduce its market share to a level that would undermine the FTC's prima facie case. *See JELD-WEN,* 988 F.3d at 715 (defendant "had to show that [the acquired firm's] market share would have dropped from 16% down to about 3% absent the merger" and fell "far short of proving that")*.* Instead, the district court held that LNR would "most likely close" absent the transaction, "fully eliminating it as a competitor capable of being the subject of a prima facie case." Op. 50. Again, this analysis conflates the failing-firm and weakened-competitor defenses. The weakened-competitor defense applies where the acquired firm will *not* close but is so weak that it cannot be an effective competitor. Thus, the court could not simply assume that LNR's market share would fall to zero. It was required to examine how much the market share would drop as a result of the weakened competition status and address how that would impact the HHI market concentration analysis. The district court's failure to conduct that analysis was error. *See Hershey*, 838 F.3d at 336

(recognizing that "incomplete economic analysis or an erroneous economic theory" is "legal error subject to plenary review").

Furthermore, if the district court had conducted the proper analysis under the second prong, it could not reasonably have concluded that LNR's competitive weaknesses were sufficient to undermine the FTC's prima facie case because the FTC's analysis already took these weaknesses into account. The FTC's analysis assumed that the ALN was "already open and operating at near full capacity," ECF 231 at 13, and reduced LNR's post-transaction market share accordingly. There is no basis for a further reduction based on the competitive threat posed by Atrium.

### C.  The District Court Erred in Holding That the Closure of Davis Could Rebut the FTC's Showing of Anticompetitive Effect.

The district court also erred when it held that evidence "that Davis will close absent the transaction" could rebut the FTC's prima facie case. Op. 48. It is undisputed that Davis is a behavioral health hospital that does not provide inpatient general acute care and hence is outside the relevant product market. The Supreme Court has squarely held that "anticompetitive effects in one market" cannot "be justified by procompetitive consequences in another." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 370 (1963). And in any event, the FTC is not seeking to block Novant's acquisition of Davis. Defendants are free to proceed with that part of the transaction if they wish to do so.

**D.** **The District Court Erred In Its Analysis of the Public Interest Factors.**

Finally, the district court erred in its analysis of the public interest factors. Once the FTC shows a likelihood of success, defendants "face a difficult task in justifying the nonissuance of a preliminary injunction." *Hershey*, 838 F.3d at 352. Where the FTC seeks a preliminary injunction, the principal equitable consideration is "the public's interest in effective enforcement of the antitrust laws." *Id.* That factor is "particularly important" because "should the Hospitals consummate the merger and the FTC subsequently determine that it is unlawful, it is extraordinarily difficult to 'unscramble the egg.'" *Id.*; *see also FTC v. Dean Foods Co.*, 384 U.S. 597, 606 n.5 (1966) ("Administrative experience shows that the Commission's inability to unscramble merged assets frequently prevents entry of an effective order of divestiture."); *Heinz*, 246 F.3d at 727 ("[I]t will be too late to preserve competition if no preliminary injunction has issued.").

The district court gave short shrift to these important considerations, holding that it would not be "any harder to sell LNR … than it would be currently if a divestiture is later ordered." Op. 53. The FTC's recent experiences show otherwise. For example, in 2011, when the Commission challenged a hospital merger in Georgia that would have created a monopoly, the district court denied a request for preliminary injunctive relief, allowing the merger to close. Although the FTC eventually prevailed before the Supreme Court, *see FTC v. Phoebe Putney Health*

*Sys., Inc.*, 568 U.S. 216 (2013), the Commission ultimately concluded more than two years later that divestiture was "virtually impossible" and the parties remained merged.[3] In another case involving hospitals in Idaho, divestiture did not occur for more than two years after the Ninth Circuit affirmed that the merger was unlawful.[4] Divestitures are particularly problematic in the hospital context because once they merge, hospitals may alter their operations and share strategic information, including data on their rate negotiations with insurers, which may make it impossible to restore competition.

The district court also placed too much weight on Novant's promise not to raise rates at LNR or Davis for three years. There is no means of enforcing this promise, and in any event the Court gave no consideration to other immediate harms that flow from a consummated deal, such as operational changes, sharing of competitive information, and raising of reimbursement rates at other Novant hospitals due to increased bargaining leverage. Finally, the court appears to have placed great weight on CHS's statement that it intended to close Davis if the sale

---

[3] Statement of FTC, *In re Phoebe Putney Health Sys., Inc.*, No. 9438 (Mar. 31, 2015), at https://www.ftc.gov/system/files/documents/public_statements/634181/150331phoebeputneycommstmt.pdf.

[4] *See St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys.*, 778 F.3d 775 (9th Cir. 2015); *St. Alphonsus Med. Ctr. v. St. Luke's Health Sys.*, No. 1:12-cv-00560 (D. Idaho Dec. 15, 2020) (Fourth and Final Verified Report Concerning Compliance showing divestiture in May 2017).

does not go through. But as noted above, the FTC is not seeking to prevent Novant's acquisition of Davis, only LNR.

## II. THE EQUITIES STRONGLY FAVOR AN INJUNCTION PENDING APPEAL.

Where the FTC seeks an injunction pending appeal, the Court's analysis of the remaining *Nken* factors focuses on the "balancing of *public* equities." *Food Town*, 539 F.2d at 1344. The public equities here strongly favor issuance of an injunction pending appeal. For all the reasons discussed above, if Novant's acquisition of LNR goes forward now, the FTC and the public will suffer irreparable injury because it will be extraordinarily difficult—and perhaps impossible—to unwind the transaction and restore LNR as a viable competitor if the FTC finds the transaction unlawful.

In contrast to public equities, any "*private* injury which may result from an injunction delaying the merger" is entitled to "little weight." *Food Town*, 539 F.2d at 1346. Otherwise, the court risks undermining "section 13(b)'s purpose of protecting the public-at-large, rather than individual private competitors." *Univ. Health*, 938 F.2d at 1225. In any case, defendants will not be substantially injured by a short delay while the Court considers the merits of the appeal. The parties began to pursue the acquisition almost two years ago. "[I]f the merger makes economic sense now," it likely will remain "equally sensible" after this Court decides this appeal. *Hershey*, 838 F.3d at 352-53; *accord Heinz*, 246 F.3d at 726-

27. Any impact of delay on defendants pales in comparison to the harm to the public from allowing Novant to acquire LNR and eliminating any prospect of meaningful relief should the FTC's appeal succeed.

## CONCLUSION

This Court should issue an injunction barring the acquisition of LNR pending appeal.

June 11, 2024                                    Respectfully submitted,

                                                 ANISHA S. DASGUPTA
                                                     *General Counsel*

                                                 MARIEL GOETZ
Of Counsel:                                          *Acting Deputy General Counsel*

NATHAN BRENNER
KAREN H. HUNT                                    /s/ Benjamin F. Aiken
NICOLAS STEBINGER                                BENJAMIN F. AIKEN
HABIN CHUNG                                      JESSELYN FRILEY
JENNIFER FLEURY                                  MATTHEW M. HOFFMAN
CORY GORDON                                          *Attorneys*
CHRISTOPHER HARRIS
MATTHEW JOSEPH                                   FEDERAL TRADE COMMISSION
KENNAN KHATIB                                    600 Pennsylvania Avenue, N.W.
RYAN MADDOCK                                     Washington, D.C. 20580
NOEL MILLER                                      (202) 326-2151
SUSAN A. MUSSER                                  baiken@ftc.gov
LOUIS NAIMAN
JEANNE L. NICHOLS
ANUSHA SUNKARA
ANNA VAN DE STOUWE
GOLDIE VERONICA WALKER
KURT D. WALTERS
    *Attorneys*

FEDERAL TRADE COMMISSION
Washington, D.C. 20580

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that the foregoing motion complies with the type-volume limitations of Fed. R. App. P. 27(d) and 32(a)(5) because it is in 14-point Times New Roman type and contains 5,077 words, as counted by Microsoft Word, excluding the items that may be excluded under Fed. R. App. P. 32(f).

June 11, 2024

/s/ Benjamin F. Aiken
Benjamin F. Aiken
Attorney
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580