No. 24-1526

# In the United States Court of Appeals for the Fourth Circuit

———————————

FEDERAL TRADE COMMISSION,
*Plaintiff-Appellant,*

*v.*

NOVANT HEALTH, INC.; COMMUNITY HEALTH SYSTEMS, INC.,
*Defendants-Appellees.*

———————————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA (NO. 5:24-CV-0028-KDB-SCR) (HON. KENNETH D. BELL)*

———————————

**JOINT OPPOSITION TO EMERGENCY MOTION FOR INJUNCTION**

———————————

MICHAEL J. PERRY
JAMIE E. FRANCE
GIBSON, DUNN & CRUTCHER LLP
 *1050 Connecticut Avenue N.W.*
 *Washington, DC 20036*
 *(202) 887-3558*
 *mjperry@gibsondunn.com*

*Counsel for Defendant-Appellee Community Health Systems, Inc.*

HEIDI K. HUBBARD
SARAH M. HARRIS
MARK S. STORSLEE
ERIN M. SIELAFF
WILLIAMS & CONNOLLY LLP
 *680 Maine Avenue S.W.*
 *Washington, DC 20005*
 *(202) 434-5000*
 *sharris@wc.com*

*Counsel for Defendant-Appellee Novant Health, Inc.*

## DISCLOSURE OF CORPORATE AFFILIATIONS

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Novant Health, Inc. states that it does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Community Health Systems, Inc. states that it does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

## INTRODUCTION

Emergency injunctions are reserved for emergencies. This Court intervenes only to prevent imminent, irreparable harm when the movant will likely win on appeal later and an injunction will not impose countervailing harms.

But FTC's eleventh-hour gambit to enjoin this small hospital transaction as a threat to competition is pure Chicken Little. Following a 7-day trial featuring 23 witnesses and thousands of pages of exhibits, the district court issued a 55-page opinion denying FTC's request to block one hospital system (Novant) from acquiring two Charlotte-area hospitals currently owned by Community Health Systems, Inc. (CHS). That decision rests on unique factual considerations about the commercial realities of the Charlotte-area hospital market.

On the merits, the court found FTC "(barely) met the *mathematical* thresholds for a 'prima facie case.'" A155. Nonetheless, the court ultimately found "in light of all the commercial realities," A155, that the transaction is "at least as likely to enhance competition as it is to reduce it," A147. Without the transaction, the two hospitals would likely close, leaving Atrium—the biggest competitor—dominant. With the transaction, Novant would keep those hospitals open, expand services, and revitalize competition. On the equities, the court found substantial public benefits and refused to block a transaction that FTC could still potentially unwind, without discernible irreparable harm.

Now, FTC must satisfy an even more demanding standard: FTC must show likely success on the merits of its appeal; likely, imminent irreparable harm if the transaction is not enjoined; and a lack of countervailing equities and public-interest considerations. FTC comes nowhere close. The district court's rulings on the merits and equities rest on extensive factfinding subject to clear-error review—most of which FTC does not even challenge. FTC instead inaptly attacks the court's finding that Lake Norman will likely close absent the transaction, while ignoring two major reasons why this deal is not anticompetitive: (1) Lake Norman is not a significant competitor today, and

(2) Atrium is by far the dominant competitor, and this deal enhances competition with Atrium and other Charlotte-area hospitals.

On the equities, FTC remarkably suggests that acquisitions *always* create irreparable harm because divestitures are difficult. FTC's track record belies that argument: many courts have refused to preliminarily enjoin more complex transactions. *E.g.*, *FTC v. Thomas Jefferson Univ.*, 2020 WL 8455862, at *1 (3d Cir. Dec. 21, 2020); *FTC v. Microsoft Corp.*, No. 23-15992 (9th Cir. July 14, 2023) (dkt. entry); *FTC v. Foster*, 2007 WL 3023158, at *1 (10th Cir. May 31, 2007).

FTC's delay here further counsels against emergency relief. Like those cases, the acquisition was set to close days after the district court denied a preliminary injunction. Unlike those cases, FTC dragged its feet, waiting five days to ask the district court for emergency relief and demanding a ruling in "less than 24 hours." A154 n.1. The court denied FTC's request. But, to prevent FTC from "perhaps intentionally" jamming this Court with less than a day to rule on an emergency-injunction request before the deal could close, the district court reluctantly extended the temporary restraining order to June 21. A158 n.4. FTC does not explain these tactics, or even address the supplemental reasoning in the district court's stay order. This Court should continue

3

to limit extraordinary relief to extraordinary circumstances, deny FTC's request, and vacate the TRO.

## BACKGROUND

### A.    CHS's Charlotte-Area Hospitals

CHS is a for-profit healthcare system headquartered in Tennessee operating hospitals nationwide. But CHS faces serious financial straits. CHS carries roughly $11.5 billion in debt, and "does not generate enough cash flow to cover its costs." A112. In 2023, CHS borrowed $400 million just to fund its operations. A112. CHS currently pays $800 million annually to service its debt, and that figure will soon climb past $1 billion annually. A112.

In North Carolina, CHS operates only two hospitals, both in the Charlotte area: Lake Norman Regional Medical Center and Davis Regional Psychiatric Hospital. A111. Both currently face monumental challenges from CHS's financial decline and corresponding lack of investment.

Lake Norman is in trouble. From 2007-2023, Lake Norman cut its number of services by roughly 30%, including shuttering or restricting neonatal intensive care, oncology treatments, and care for the highest-risk heart attacks. DA2-3 ¶8; A126-27. CHS also "effectively 'downsized'" Lake Norman,

staffing only 40-70 of 123 licensed beds.  A125.  CHS delayed or rejected necessary capital expenditures on upgrades, even choosing to rent rather than replace anesthesia equipment that "burst into flames."  DA14-15; A127.

Lake Norman's financial woes hamper employee retention.  Over 30% of nurses leave within a year.  A127-28.  Emergency-room and med-surg vacancies stand at 50%.  A128.  At night, a single Lake Norman physician covers the emergency room, with a single nurse-practitioner monitoring inpatient beds upstairs.  A128.

As for CHS's Davis facility, after years of low patient volume and unsustainable finances, Davis in 2022 terminated all acute care services.  DA3 ¶9.  Today, Davis operates some behavioral-health beds, with the rest of the hospital dark.  DA3 ¶9.

Both hospitals teeter on the precipice of non-viability.  CHS's debt exceeds its earnings by eightfold, and CHS must be selective about where to invest limited resources.  DA30-34.  These two hospitals have not made that cut: their per-bed capital expenditures are by far the lowest among Charlotte-area hospital systems.  DA2-4 ¶¶8, 24.  CHS officials consider Lake Norman's future bleak, like more than 100 other hospitals CHS has recently sold or closed after failing to find buyers.  DA35-36; A116-17.  Absent intervention, Lake

Norman will likely close "shortly," in the "foreseeable future," A102, A146, while Davis would close "immediately," A128.

In July 2022, CHS began soliciting bids for these two hospitals. A117.

## B.    The Proposed Transaction

Despite CHS's best efforts, CHS attracted just one bidder: Novant Health, Inc., a not-for-profit healthcare system headquartered in North Carolina that has served Charlotte-area patients for over a century. A111; *About*, Novant Health (2024), https://tinyurl.com/m4wtm3t5. No one else made an offer, at any price and despite CHS's urging, reflecting impediments to revitalization. A117.

To start, competition for patients is stiff, especially from Atrium Health, the "dominant" Charlotte-area healthcare system. DA3 ¶11. Atrium commands over 50% of the Charlotte-area inpatient market—double Novant's share. DA3 ¶11, DA20. In 2025, Atrium will open a 30-bed hospital in Cornelius, between CHS's Lake Norman and Novant Health Huntersville Medical Center, Novant's neighboring hospital. A114. Atrium plans to "expand [its new hospital] as needed" and "already has zoning approval for up to 140 beds" there. A115.

Novant nonetheless stepped up, having turned around other troubled hospitals. DA26-29. Novant plans a similar strategy to save Lake Norman and Davis, including by investing millions in capital improvements and restoring and expanding neonatal, surgical, cardiology, and other services. A129-30.

### C. FTC Proceedings and the District Court's Rejection of FTC's Preliminary-Injunction Request

In February 2023, Novant and CHS agreed that Novant would acquire Lake Norman and Davis. A109. Eleven months later, FTC initiated administrative proceedings to block the transaction, alleging it would "substantially … lessen competition" in violation of 15 U.S.C. § 18, and as an "[u]nfair method[] of competition" under 15 U.S.C. § 45.

FTC simultaneously asked a district court to preliminarily enjoin the transaction under 15 U.S.C. § 53(b) while FTC's lengthy administrative process unfolds. On June 5, 2024, the district court denied preliminary relief. The court required that FTC "raise questions going to the merits" that are "serious, substantial, difficult and doubtful," considering the equities on a "sliding scale." A106-07. Even under that relaxed standard, the court held—based on extensive factfinding—that FTC failed to establish the transaction was likely to substantially lessen competition, and that the equities did not favor an injunction. A101-02.

7

As to the merits, the court made a "limited" finding that FTC "barely" met the "*mathematical* thresholds" in FTC's non-dispositive merger guidelines to make out a rebuttable prima-facie case. A142, A155. The court accepted some of FTC's proposed relevant geographic and product markets, namely, the market for inpatient general acute services provided by Novant and Lake Norman within the Center-City/Northern Charlotte Region. A135-41. Even so, the court observed that Novant's market share was "mostly" due to "the already heavy concentration of the relevant market." A141-43.

Even spotting FTC that much, the district court concluded that Novant rebutted FTC's case and showed the transaction "is at least as likely to enhance competition as it is to reduce it" based on "unique economic circumstances." A144-47, A155. Absent the transaction, Lake Norman would be unlikely to "sustain [even] its current level of competition" given "the future competitive landscape." A144. And Lake Norman's "insignificant" competitive position (a view insurers confirmed) would "further erode to the point where it will most likely close in the foreseeable future." A100, A146. Rather than requiring CHS to "continue to drive [Lake Norman] down the same road until the proverbial wheels fall off," the transaction would let Novant reinvigorate the facilities and better compete with Atrium and others. A100, A147-48.

The court also held, as independently dispositive, that the equities disfavored injunctive relief. A155-56. With the transaction, "immediate" competitive harm was unlikely; insurers testified the acquisition would have little or no impact on Novant's reimbursement rates, Novant committed to hold rates steady for three years anyway, and Novant's improvements to the hospitals would make a sale easier if divestiture were later ordered. A121, A149. Meanwhile, the transaction would allow Davis to remain open—preserving crucial psychiatric services—while also allowing Novant to restore services, staff, and infrastructure at Lake Norman. A150.

## LEGAL STANDARD

Courts of appeals grant injunctions pending appeal only in extraordinary circumstances, because of "concerns" that a court will "allow or disallow anticipated action before the legality of that action has been conclusively determined." *Nken v. Holder*, 556 U.S. 418, 434 (2009). FTC must show (1) a likelihood of success on the merits of its appeal of the denial of the preliminary injunction, (2) likelihood of irreparable harm absent relief, (3) that the injunction will not substantially harm the other party, and (4) that an injunction benefits the public. *The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009), *reissued* 607 F.3d 355 (4th Cir. 2010).

## ARGUMENT

### I.    FTC Is Unlikely to Succeed on the Merits

FTC's unlikelihood of prevailing on the merits of its appeal alone dooms FTC's request.  After evaluating thousands of pages of evidence and hearing from 23 witnesses, the district court made a dispositive, fact-laden finding that the transaction "is at least as likely to enhance competition as it is to reduce it."  A147.  The record strongly supports that finding, and courts of appeals review such fact-heavy determinations only for clear error.  *E.g.*, *FTC v. Sanford Health*, 926 F.3d 959, 962-63, 966 (8th Cir. 2019).  Further, FTC's prima-facie case was weaker than the district court credited, and constitutional flaws in FTC adjudications would necessitate vacating any FTC order.

Indeed, FTC's case failed even under the district court's lax "'public interest' standard" for FTC preliminary injunctions, which required only "substantial" questions on the merits, A103, A106—not the proper, higher "substantial likelihood" of prevailing standard.  *FTC v. Atl. Richfield Co.*, 549 F.2d 289, 291 (4th Cir. 1977); 15 U.S.C. § 53(b); *accord Starbucks Corp. v. McKinney*, No. 23-367, slip op. at 4 (U.S. June 13, 2024).  FTC's contrary suggestion (at 12) that district courts should rubber-stamp injunctions anytime FTC

makes a prima-facie showing of possible anticompetitive effects defies the statutory requirement that FTC demonstrate "likelihood of ultimate of success." 15 U.S.C. § 53(b).  This Court thus demands that FTC demonstrate a "substantial likelihood … FTC will prevail," not just meet its threshold burden. *Atl. Richfield*, 549 F.2d at 291; *accord Starbucks*, slip op. at 4-5.  FTC's cited cases (at 12) do not hold otherwise; in each, courts considered the defendants' rebuttal arguments.

## A.      Defendants Refuted Any Presumptive Anticompetitive Effect

FTC cannot show a likelihood of prevailing in this appeal because its antitrust case is weak.  FTC must first show a prima-facie case of anticompetitive harm, *i.e.*, that in a relevant geographic market for a specified product, the transaction is presumptively anticompetitive based on "the market's concentration before and after the merger." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 703-04 (4th Cir. 2021).  But the transaction can still proceed if defendants show it is unlikely to substantially lessen competition. *Id.*

Here, the district court relied on extensive factfinding to hold that even though FTC "barely" eked out a mathematical prima-facie case, defendants rebutted the theoretical presumption of anticompetitive harm.  A155.  The court appropriately looked to the "'structure, history and probable future' of

the relevant industry," not just "*mathematical* thresholds." A155 (quoting *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974)). The court found that allowing the transaction will revitalize Lake Norman, stave off its closure, and let Novant better compete with Atrium, Charlotte's "dominant" healthcare provider, and others. A112, A144-48.

FTC identifies no clear errors in any underlying factfinding. And the court's narrow, case-specific holding that *this* particular transaction is not anticompetitive aligns with caselaw. Measured by number of beds to be acquired, this transaction is by far the smallest of FTC's recent hospital-merger cases, reinforcing its minimal competitive effects.[1]

### 1.     The Transaction Will Enhance Competition

The district court held—based on a "holistic but detailed analysis"—that specific evidence of the transaction's competition-enhancing qualities refuted FTC's theoretical concerns. A155. FTC does not fault the court's underlying legal framework, which requires "compar[ing] what may happen if the merger occurs with what may happen if the merger does not occur." *FTC v. Nat'l Tea*

---

[1] *Cf., e.g.*, Compl. ¶21, *FTC v. Advoc. Health Care Network*, 15-cv-11473 (N.D. Ill. Dec. 22, 2015) (to-be-acquired hospital had 801 beds); *FTC v. Penn State Hershey Med. Ctr.*, 185 F. Supp. 3d 552, 554 (M.D. Pa. 2016) (646 beds); *FTC v. Hackensack Meridian Health, Inc.*, 2021 WL 4145062, at *3 (D.N.J. Aug. 4, 2021) (531 beds).

*Co.*, 603 F.2d 694, 700 (8th Cir. 1979). FTC's objections (at 12-18) are backdoor attacks on the court's factfinding—an insurmountable lift given clear-error review.

The district court's holding rested on extensive factfinding about the bleak competitive outlook absent the transaction. The court found Lake Norman "will not be able to sustain its current level of competition," partially because CHS "close[d] lines of service" and cut off "additional investments." A144. The court thus found that Lake Norman occupied a "relatively insignificant competitive position." A100. Plus, changes to North Carolina's hospital-licensing processes will "increase competition for outpatient services," which—along with the opening of Atrium's nearby hospital—further dim Lake Norman's financial and competitive outlook. A144-45. Without the transaction, Charlotte-area healthcare remains dominated by Atrium, especially given Lake Norman's likely closure. A100-02, A112-13.

The court also found the transaction "is at least as likely to enhance competition as it is to reduce it," A147, and will facilitate "vigorous competition" with "Atrium and … Iredell Health." A148; *accord* A100, A116. As to Lake Norman, the court found that Novant will "replace the lost lines of service and otherwise reinvigorate and support the hospital and its staff." A147. And the

13

transaction would "put Novant in a better competitive position versus Atrium for Lake Norman area patients." A147-48. Meanwhile, insurers testified they either had no opinion or thought the acquisition would have "little or no impact" on Novant's reimbursement rates given Lake Norman's "limited competitive position." A121. FTC disputes virtually none of this, let alone shows that these findings were clear error.

FTC (at 12-18) disagrees with *how* the district court weighed evidence that Lake Norman will likely close. *See* A146. FTC (at 13-18) objects that the court could only credit that evidence pursuant to the strict criteria for the "failing firm" or "weakened competitor" defenses—*i.e.*, proving Lake Norman's "imminent" failure or showing that its market-share would have fallen so precipitously as to undermine FTC's prima-facie case.

But, as the court explained, FTC is "shoehorning" the court's analysis "into various rigid doctrinal pigeonholes." A155. Weakened-competitor and failing-firm defenses aside, the district court found based on "the bigger picture" that the transaction was unlikely to substantially lessen competition because FTC's statistics did not accurately reflect "commercial realities." A155, A144-48. FTC fixates on statistical modeling over "unique economic circumstances," A133-34 (citation omitted), even though market-share statistics are

"not conclusive indicators of anticompetitive effects," *Gen. Dynamics*, 415 U.S. at 498; A155. This dooms FTC's case.

FTC's objections thus "cherry pick[]" and "distort[]" the district court's reasoning and ignore the wealth of evidence about "actual competitive circumstances" indicating the transaction would not be anticompetitive. A155. In particular, the court cited Atrium's market dominance, the lack of any other likely buyers for Davis and Lake Norman, and CHS's lack of investment. A155, A145-48. Upcoming changes to the state hospital-bed licensing process and Atrium's new nearby hospital also independently show why the transaction is not anticompetitive. A144-45. Those key factual findings—which FTC does not dispute—undercut the reliability of FTC's market-share analysis. *See Gen. Dynamics*, 415 U.S. at 498.

Regardless, FTC's argument is meritless. The court *did* find that Lake Norman would close "shortly," A102, due to "competitive challenges," A155, and did not clearly err, *contra* FTC Br. 14-15. Testimony confirmed CHS's dire financial condition, Lake Norman's noncompetitive state, the lack of other buyers, and that CHS had already closed other hospitals facing similar competition after failing to find a buyer. A112, A126-28; DA38-39. CHS testified that Lake Norman's anticipated 11.3% profit margin would be unsustainable

15

because the interest-on-debt payments equal that margin and CHS would not invest in Lake Norman if the transaction falls through.  DA40-44.  And CHS testified unequivocally that it expects Lake Norman's "financial performance" to "continue to decline," there are no "good prospects … to reverse [that] trend[]" given Atrium's new hospital, and it has already closed other hospitals presenting a "similar fact pattern."  DA35-39.

FTC's arguments (at 15-18) that the district court tacitly but wrongly applied the weakened-competitor defense likewise fail.  Again, the court looked to commercial realities that rebut FTC's mechanical mathematics under *General Dynamics*, not to this defense.  A144-48, A155.  Regardless, FTC is wrong.  FTC (at 15-16) presses that Lake Norman's closure does not show the hospital is "too weak to affect competition."  But, by definition, an entity that no longer exists is "too weak to affect competition."  A145-47.  And the court made multiple findings as to why Lake Norman is an "insignificant" and declining competitor.  A100.  FTC (at 16-17) faults the court for failing to find that no competitive means could address Lake Norman's weakness.  But again, the court *did* find that Lake Norman would close absent the transaction due to declining investment, external competition, and the lack of other buyers.  A144-48.

16

FTC (at 17-18) also faults the district court for failing to find that Lake Norman's market-share would have dropped so as to make the transaction presumptively lawful under the Herfindahl-Hirschman Index. But the court rightly dismissed putting dispositive weight on whether the transaction would "slightly exceed[]" FTC's guidelines, because that number was "mostly the result of the already heavy concentration of the relevant market," not Lake Norman's "competitive presence." A098-99, A143; *accord* A155. Based on real-world evidence, the court explained that Lake Norman may be "profitable for now," but "a competitive 'wreck' appear[ed] to be on the immediate horizon," A100, given "numerous current *and* future competitive challenges," A155. The on-the-ground "competitive circumstances"—especially Atrium's dominance and CHS's lack of investment—required looking "beyond the economic numbers," and established that the transaction would not likely "substantially … lessen competition." 15 U.S.C. § 18; A097-99, A144-48.

Regardless, FTC's cited weakened-competitor cases are distinguishable. Those cases discounted evidence of selling companies' struggles because they had options besides merging. *See JELD-WEN*, 988 F.3d at 714-16 (multiple other bidders); *accord* A145-47 (discussing cases). Here, CHS lacked any other bidders and only the transaction would prevent closure. A146-48. The

17

"weakness [of the to-be-acquired firm] undermines the predictive value of the government's market share statistics," *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 154 (D.D.C. 2004) (citation omitted), making this evidence relevant. *See* A146-48; *Gen. Dynamics*, 415 U.S. at 498. FTC's weak attempt (at 17) to suggest CHS should have sought bids from out-of-state providers ignores the court's finding that CHS "conducted a diligent search" for buyers and there was "no evidence … that a new bidder would emerge." A117, A128.[2]

Finally, FTC (at 18) faults the district court for relying on Davis in evaluating the transaction's anticompetitive effects because Davis fell outside FTC's product market. But Davis's closure was not dispositive to the analysis, *see* A144-48, providing no grounds for emergency relief.

### 2.    FTC Failed to Define the Relevant Market

FTC is also unlikely to prevail because it failed to establish a prima-facie case. The district court held otherwise under a too-forgiving standard that incorrectly endorsed FTC's proposed geographic and product markets.

---

[2] FTC (at 13 n.2) briefly accuses the court of failing to apply "the strict standards" for the so-called efficiencies defense regarding evidence that the transaction will improve Lake Norman's quality. The court barely credited that evidence anyway, noting that quality improvements were "unlikely to have much competitive effect." A147.

Courts first consider the geographic market, *i.e.*, "the area in which consumers can practically turn for alternatives sources of the product," based on "a factual inquiry into the commercial realities faced by consumers." *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1052 (8th Cir. 1999). The district court rightly rejected FTC's primary, gerrymandered market. A140-41.

But the court also should have rejected FTC's alternative Center-City/Northern Charlotte Region market, which encompassed "the hospitals that over 90% of Lake Norman Area residents visit." A139. That supposed market ignores commercial reality: insurers set reimbursement rates for the whole "Charlotte market," not this subset.[3] Even the government used the "Charlotte area" as the market in litigation against Atrium. DA5 ¶66. The Center-City/Northern Charlotte definition inexplicably excludes hospitals directly competing with Novant and Lake Norman, including CaroMont and Atrium Pineville. DA50-51.

The district court rejected the Charlotte-area market as too broad, claiming "the distance between hospitals" is "too far to consider them to be

---

[3] DA11-13, DA16-19, DA45-49.

effective substitutes." A141 n.25. But the court identified no evidence supporting that inference, which makes little sense when insurers have structured their businesses around the contrary proposition that Charlotte-area hospitals generally are competitors. *Supra* p. 19 & n.3.

FTC's product-market definition, which "identifies the object of Defendants' competition," also fails. *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 292 (D.D.C. 2020). The district court, aligning with FTC, defined that market as inpatient general acute-care services that both Lake Norman and Novant Huntersville offer to commercial insurers. A137.

But hospitals often offer inpatient services on an outpatient basis and contract for both services in one agreement with insurers. DA21-23, DA47-48. By failing to include both services, the product-market definition was legally flawed. *See United States v. Carilion Health Sys.*, 892 F.2d 1042, at *3 (4th Cir. 1989) (unpublished table decision).

Moreover, restricting the product market to overlapping services—services that both Lake Norman and Novant Huntersville offer—overlooks commercial realities. Insurers contract for a hospital system's full range of ser-

vices.  DA47-48, DA52-53.  Lake Norman's service lines have declined, so limiting the market to overlapping services excludes terminated services, creating a too-rosy picture of existing competition.  *See* DA24-25.

### B.    Constitutional Defects Further Weaken FTC's Prospects

Though the district court sidestepped this issue, A131 n.21, constitutional problems additionally undercut FTC's chances.

1.  FTC's structure unconstitutionally restricts the President's removal authority.  FTC's Commissioners exercise sweeping executive powers.  *Cf. Collins v. Yellen*, 141 S. Ct. 1761, 1772 (2021).  Yet the President can remove them only for cause, contravening his "unrestricted removal power."  *See Seila L. LLC v. CFPB*, 591 U.S. 197, 204 (2020); 15 U.S.C. § 41.  FTC's accumulation of power dictates a different result today than circa 1935.  *See Seila L.*, 591 U.S. at 215-18 & n.2.

FTC ALJs are also impermissibly insulated.  ALJs can only be removed for cause.  5 U.S.C. § 7521.  The same restrictions apply to FTC Commissioners—who initiate removal—and Merit System Protection Board members—who decide if cause exists.  15 U.S.C. § 41; 5 U.S.C. §§ 1202(d), 7521(a).  Given ALJs' "substantial executive functions," these multi-layered protections are

unconstitutional. *Jarkesy v. SEC*, 34 F.4th 446, 463 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023).

2. Further, FTC's in-house adjudicatory procedures deprive parties of "a fair trial in a fair tribunal," violating due process. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (cleaned up). FTC plays all key roles—investigator, prosecutor, judge, and jury—which fairness forbids. *See Williams v. Pennsylvania*, 579 U.S. 1, 8-9 (2016). Agency staff investigate violations. 16 C.F.R. §§ 0.16-0.17. Commissioners commence enforcement proceedings, 15 U.S.C. § 45(b), and can overturn factual findings—judging the very cases they initiated, 16 C.F.R. § 3.54(a).

FTC's in-house adjudications also violate Article III's requirement that courts adjudicate private rights, including matters that are "subject[s] of a suit at the common law." *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (citation omitted). FTC's authority to stop acquisitions implicates private rights by restricting the disposal of property. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 198-99 (2023) (Thomas, J., concurring).

Finally, FTC's discretion over whether cases proceed in courts or in-house offends non-delegation and due-process principles. *See Jarkesy*, 34 F.4th at 461. Congress cannot delegate to agencies "unfettered authority to

choose" where to bring enforcement actions, as FTC's process does here.  *See id.* at 459-62.

## II.    FTC Cannot Show Irreparable Harm

Independently, FTC's request fails because FTC made no "clear showing" of likely irreparable harm absent an injunction.  *See The Real Truth About Obama*, 575 F.3d at 346.  As the district court explained, "there will likely be no actual, immediate competitive harm if Novant begins to operate Davis and [Lake Norman]."  A156.

FTC seeks an injunction to preserve its "ultimate remedial power"—so FTC must show "why [its] own relief … at the conclusion of the agency process cannot address the violations."  *Cf. NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 440 (4th Cir. 2018) (citation omitted).  But here, as the district court found, FTC presented no evidence "that it would be any harder to sell [Lake Norman] or Davis than it would be currently if a divestiture were later ordered.  In fact, it seems reasonable that a sale might be easier if Novant improves the hospital as it has promised."  A149, A156-57.

That finding reflects reality—only in "rare case[s]" are acquisitions "truly irreversible."  *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1033 (D.C. Cir. 2008).  FTC (at 19-20) disagrees, saying divestiture is generally difficult.

But the district court did not clearly err in finding that "those are simply not the facts here," since "CHS is selling its only two hospitals in North Carolina to Novant." A157, A149. Anyway, FTC's argument would empower FTC to claim *per se* irreparable harm from any merger. Other courts have resoundingly rejected that claim and denied FTC's similar emergency-injunction requests. *Supra* p. 3. Nor do FTC's authorities support a blanket divestiture-is-irreparably-hard rule. In *In re Phoebe Putney Health System, Inc.*, for instance, Georgia's "laws and regulations" rendered divestiture "virtually impossible."[4] FTC makes no showing that North Carolina's laws would dictate the same result here.

FTC has failed to show this transaction would inflict "actual and imminent" irreparable harm to consumers or competition. *See Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). FTC (at 20) faults the district court for "plac[ing] too much weight on Novant's promise not to raise rates" at Lake Norman. But FTC cannot show clear error—the record supported the court's reliance on that promise, confirming

---

[4] Statement of FTC, *In re Phoebe Putney Health Sys., Inc.*, No. 9438 (Mar. 31, 2015), https://tinyurl.com/4z7zf6sx.

FTC's fear is "incorrect[]." A129, A149, A156. When asked about the transaction's effect on Novant's reimbursement rates, insurers "had no opinion" or "believed there would be little or no impact based on [Lake Norman's] currently limited competitive position." A121. As the district court found, the transaction will likely "put Novant in a better competitive position versus Atrium," the "dominant" health system aiming to augment its competitive advantage with a new nearby hospital at the expense of Lake Norman. A112, A147-48. Regardless, changed rates are not *irreparable* harm simply because FTC speculates they might be hard to address later.

FTC (at 20) also fears difficulties in unwinding "operational changes." If such challenges counted as irreparable, irreparable harm would be meaningless. Regardless, FTC cites no evidence to support these vague concerns. And the district court found that the public would *benefit* from solving Lake Norman's staffing shortages, retaining "the same … medical staff" and improving its records system, and "a [post-divestment] sale might be easier if Novant improves the hospital as it has promised." A122, A149, A157.

FTC's unsubstantiated allegation (at 20) that the transaction would result in sharing "competitive information" likewise fails. That harm is hardly "actual" or "imminent," *see Direx Israel*, 952 F.2d at 812, especially when FTC

neither identifies specific information nor explains how it could facilitate anti-competitive behavior.  Plus, the district court found, information-sharing could be "pro-competitive after divestiture" because Lake Norman "would know Novant's 'playbook.'"  A157.

## III.  The Equities Strongly Disfavor an Injunction Pending Appeal

Countervailing equities and the public interest "clearly" militate against an injunction, "fully support[ing] the [c]ourt's ruling" independently of the merits.  A156.  As the district court found, "[n]o public interest will be served by a stay."  A158.  An injunction pending appeal risks irreversibly squandering Lake Norman and Davis's best and only chance at revitalization.  If the transaction is enjoined, as the court found, Lake Norman and Davis will further dwindle, as declining investment rates, reduced services, and competition from Atrium impose insurmountable odds.  A101-02.  With no other bidders, "Davis will close" and Lake Norman "will shortly" close.  A101-02.  Further delay jeopardizes defendants' "willingness to proceed with the transaction," since the transaction has already been paused for over a year.  A157.  This outcome would "reduce rather than enhance competition."  A102.

FTC (at 21) argues that the transaction "likely will remain 'equally sensible' after this Court decides this appeal."  That overlooks the court's finding

that defendants are unlikely to tolerate further delay in consummating the merger.  A157.  And FTC identifies no evidence to substantiate its view, so it cannot show that the court clearly erred in concluding otherwise.

FTC (at 20-21) faults the district court for considering Davis's closure, since Davis was excluded from the product market.  But the equities include an injunction's full range of benefits and downsides, and Davis's closure would "visit[] real harm" by "elimin[ating] critically needed inpatient psychiatric services."  A156, A150.

By contrast, denying an injunction allows Novant to revitalize both hospitals by "restoring medical services, adding staff, raising salaries, and making investments in equipment and infrastructure."  A150.  The court found that this outcome would significantly increase competition and benefit "patients and the community."  A156, A150-51.  FTC's actions have already delayed those benefits by over a year.  This Court should not reward FTC's last-ditch claims of "emergency" and should deny FTC's request as soon as practicable.

## CONCLUSION

This Court should deny FTC's request for an emergency injunction pending appeal and vacate the temporary restraining order.

Respectfully submitted,

/s/ Sarah M. Harris

MICHAEL J. PERRY
JAMIE E. FRANCE
GIBSON, DUNN & CRUTCHER LLP
  *1050 Connecticut Avenue N.W.*
  *Washington, DC 20036*
  *(202) 887-3558*
  *mjperry@gibsondunn.com*

*Counsel for Defendant-Appellee*
*Community Health Systems, Inc.*

HEIDI K. HUBBARD
SARAH M. HARRIS
MARK S. STORSLEE
ERIN M. SIELAFF
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue S.W.*
  *Washington, DC 20005*
  *(202) 434-5000*
  *sharris@wc.com*

*Counsel for Defendant-Appellee*
*Novant Health, Inc.*

JUNE 13, 2024

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Sarah M. Harris, counsel for Novant Health, Inc. and a member of the Bar of this Court, certify, pursuant to Federal Rules of Appellate Procedure 27(d) and 32(a)(5), that the attached Joint Opposition to Emergency Motion for Injunction is proportionately spaced, has a typeface of 14 points or more, and contains 5,177 words.

/s/ *Sarah M. Harris*
SARAH M. HARRIS

JUNE 13, 2024

## CERTIFICATE OF SERVICE

I, Sarah M. Harris, counsel for Novant Health, Inc. and a member of the Bar of this Court, certify that, on June 13, 2024, a copy of the attached Joint Opposition to Emergency Motion for Injunction was filed with the Clerk and served on the parties through the Court's electronic filing system. I further certify that all parties required to be served have been served.

/s/ *Sarah M. Harris*
SARAH M. HARRIS